Case No. 14-1182 at L. Pallet Companies, Inc., a subsidiary of IFCO Systems, NA, Inc. Petitioner v. National Labor Relations Board. Mr. Devine, Petitioner. Ms. Rajapasky is the respondent. Shana, Shana, can you come to where the podium is? Yes, Judge, good morning. There's some rushing sound, and I don't think it's here. I think it's in that courtroom, and it comes on and off. It's on right now, I think. Okay, well, I do have my wireless mic. It's muted at the moment. Do you only hear the rushing sound? Is there a key? There's no key on it, is there? No, but the air conditioner is on very low. That could be what you're hearing. No, it keeps going on and off. It may be here, but if you all can't hear it, it must be here. Okay. No, I'm sorry. We can't hear. Okay, thank you. You're welcome. Mr. Shabbat. Good morning. Good morning. May it please the Court, I represent Pallet Companies, and we're here because the National Labor Relations Board improperly certified the union to represent certain of our employees in Burlington, New Jersey. All our reasons are fully brief, and I just wanted to point out a few things for the consideration of the Court in particular today. First is a threat to a nailer named Mr. Varlow. The Board was simply wrong in its conclusion that the threat and promise to Mr. Varlow concerning his livelihood, that there was no evidence that the forklift drivers can be selective in choosing the stacks of pallets to deliver to the nailers. So these are pallets. These are those wooden things that you stack things on. So what we do is we refurbish those. What all of the evidence shows is that the forklift drivers take the stacks of pallets from the dock and bring them to the nailers. There are assigned nailers that the forklift drivers have to go to, but there's no evidence to support that the forklift drivers are restricted on where they pick up the stacks. In fact, the evidence shows that they can pick it up on the dock or in the yard. There's no support for the conclusion that there's no discretion in choosing where those pallets come from. This is critically important because this error is the basis for the Board's conclusion that this was not objectionable conduct. They essentially said that because Mr. LaRocca couldn't control how this guy's livelihood was made, then there's essentially no harm. I thought they were relying on the testimony. Is it Mr. Rios or Rios? I don't know. Mr. Rios. I thought Mr. Rios testified that you couldn't tell the quality of the pallets. You couldn't tell in the stack. But what I'm talking about is that the quality, the stack itself, Mr. Rios said specifically, there was no indication. You couldn't control what was in the pile, but which pile you're given, you can control. And that's the testimony of Mr. Barlos, who was never discredited. It's the testimony of all the witnesses that the forklift drivers take it to and from the nailers. Now, this threat was about his ability to make a living because he made peace rate, right? So the more work you do, the more money you make. So the key here is the board ignores that any delay, okay, in what you are given. Or, you know, if you can control, yeah, most of these in this stack are bad, it impacts it. You also have to consider the circumstances of the threat. Mr. Barlos was a nailer who was asked by Mr. LaRocca to come get into a car with two paid union organizers. And these two paid union organizers and Mr. LaRocca got in the car, were in a small little space, and the conversation goes essentially, hey, the union can do stuff for you. And in the course of saying the union can do stuff for you, the issue is we can get you more money. And Mr. Barlos says, well, even if you get me an extra dollar an hour, it's not going to help me because my peace rate is what the issue is. And then LaRocca says, well, if you work with me, I'll work with you. And everybody in that car knew he was the one that controlled the quality and quantity of the pallets. And because he's in the car. But if we decided that Mr. LaRocca was not an agent of the union, what's the significance of that particular conversation? Well, I believe that the fact that the two union officials are in the car and don't repudiate or say that's not true, means they adopted it at least by their omission, his statement. If you're sitting right there and there are four people and you're in a car and one guy makes a threat and you're the one in charge and you don't cut away from it, I think the union adopts it. But let's take a minute and talk about agency. If you're right on this, by the way, it affects only one voter. Correct. And if the board decision assumed that Mr. Rios, you know, that it wasn't material, the reason he reached at the end of the day it wasn't material, he said it would not have impacted the vote because it would have been 23 to 21. If just Mr. Barlow changed his vote, it's 22 all, no majority, and a new election is. Because the standard for the NLRB is the union has to show a majority. 22 all. That's with Rios and Barlow. And Barlow. With just Barlow it's 22 to 21 instead of 23 to 20. That's correct. That's correct. But let's talk a minute about the agency piece. The board concluded that he was a, Mr. LaRocca was a special agent, but it didn't tell us the scope of the agency. What was he an agent for? We would say that he is an agent at least so far as all of the campaigning and organizing work that he did. The union conduct in using LaRocca extensively as his eyes and its ears and its conduit of information is critically important. And something that we need to point out is the halfway house people. The Bo Robinson folks. All of the evidence shows that the paid union organizers, Mr. Cecil and the others, had zero contact with the halfway house folks. They weren't able to contact them, talk to them, or anything. These halfway house folks came, were not allowed to leave the premises. So the only contact that those voters had was through Mr. LaRocca and whatever other key folks. And if you look at the testimony of all of the halfway house folks, they all say they didn't know Mr. Cecil. They only knew Mr. LaRocca as the person who was behind the union organizing. And then with regard to the numbers issue that you raised, Judge Kavanaugh, Mr. LaRocca's threat to Mr. Diamond warrants a minute of conversation here. The only evidence in the record is that Mr. Diamond was threatened by Mr. LaRocca. The board wrongly failed to draw an adverse inference with regard to the failure to call Mr. LaRocca. This is not a situation where there was some evidence on one side and some evidence on the other side and somebody made a tactical decision, I won't call a corroborating witness. This is Mr. Diamond said, Mr. LaRocca said this to me, and Mr. LaRocca wasn't called. In her opening, counsel for the union specifically referenced the fact that they weren't sure whether they were going to call Mr. LaRocca. So they had him, not to mention the fact he was a lead supporter. Well, this is your problem, that for whatever reason the ALJ made the determination that nothing Mr. Diamond said was credible. He did not make that broad a decision. He didn't discredit him on – he listed four specific factors on why he discredited him. But this is uncontradicted evidence. But why couldn't it be that the ALJ, having heard the controversy between Diamond and Little and believing Diamond, believing Little then doesn't believe Diamond for the uncontroverted as well? That seems a reasonable inference to me. I don't believe it's a reasonable inference because of the status of Mr. LaRocca, because of the fact that he was there to be called and they didn't call him. The reason they didn't call him, they knew he would have to tell the truth and he knew he would have to admit these things. I mean, that's what's going on here. It's a situation where they knew – you know, Mr. Cecil knew that Mr. LaRocca was involved in drugs. Mr. Cecil used drug rehabilitation as a campaign tool, admittedly, because he wanted to appeal to the Bo Robinson folks. He testified that way. The reason I brought up the drug rehabilitation is because I know there are drug problems in the Bo Robinson house. So the fact that he knew he was involved in drugs, he used the campaign tool of rehabilitation, supports that he incorporated all of these things. He – you lay down with dogs, you get fleas. And what happened here is that the union chose this person, worked through him, and as a result, this election should be set aside. I see I'm out of time. If you have more questions, I'll be happy to answer them. Judge Henderson, are you – No, I'm okay. Okay, great. Thank you very much. Good morning. Good morning. May it please the Court, my name is Neelakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. One of the critical points in this case, at least from the Board's perspective, is that the company had the burden of proof before the Board, not only as to the allegations of misconduct before the election, but also as to Mr. LaRocca's agency status – or, excuse me, status as an agent of the union. And the Board quite reasonably found that the company failed to carry its burden on any point. Turning to the agency issue first, Mr. LaRocca had no actual authority from the union to act generally as the union's agent. And that's absolutely clear on this record. The company is pressing the suggestion that he might have apparent authority to act for the union, or he might have had that authority at the relevant time. And that, too, is not supported by the record. Apparent authority requires a manifestation by a principal to third parties that would reasonably lead those third parties to believe that someone is authorized to act. Well, Mr. Cecil certainly used him for a lot of things, called him a key member of the team. And what about the point of his role at the halfway house? That's a little bit of an unusual fact pattern here, right? It is. It is, Your Honor. And in other cases, we've relied upon the general agent for having contact with the employees. Mr. Cecil didn't have contact with the employees at the halfway house, did he? Well, I think what the board, in part, relied on in terms of its finding no agency status is the fact that Mr. Cecil did not abdicate his role in this campaign in the way that you see a union agent abdicating his role in, say, Georgetown Dress or some of the other Fourth Circuit cases that are cited by the company. In terms of the halfway house issue in particular, Mr. Cecil did go to the halfway house. He actually testified that he went there. He left campaign literature and he left his business card for employees to contact him. And he was assured at the time that his information would be passed on. So it isn't for lack of effort on his part that he wasn't able to access those employees, perhaps. And he also was available in general. I don't think we know definitively on this record what proportion of employees lived at a halfway house. It's clear that there were a significant number. But Mr. Cecil, who was the union's representative, made himself available to employees not only by active outreach in person or on the phone to them. He also showed up at the facility. He couldn't, of course, go inside. But he met employees across the street. He met them at a Wawa nearby. He met them over their lunch. He met them at a train station on their way home. He prepared union literature. He distributed that literature. He solicited authorization cards. So this is not in any way a case factually that can be likened to Georgetown Dress, Kentucky and Tennessee Clay Company, the Fourth Circuit cases. And also, unlike in PPG Industries and Garvey Marine, which are two other cases the company cites, there isn't any kind of conduct, anything that you can latch on to in the record by the union that would convey to employees that this person is acting on our behalf. What the company is relying on, essentially, is association. And that's it. And this court, at least to my knowledge, has not found that mere association is enough to create an agency relationship. And that's absolutely clear in part from overnight transportation, which is a case of this court's, in which the court found that simply being the fact that union agents were around when purported union agent employees were acting did not create an agency relationship or make their conduct attributable to the union. So that is the board's view in terms of the agency issue. Turning to the actual substance of the objections, the board really doesn't see anything in each of these or anything in them collectively that would create such a tainted environment around the election that the election has to be set aside. If you look at the evidence, Your Honor, what you have is, and I'm just going to use sort of a summary approach here, you have one transaction in which drugs were supplied from Mr. LaRocca, by Mr. LaRocca to Mr. Rios. What about the conversation between Mr. LaRocca and Mr. Barlow, the threat? Well, as the board found, that statement, first of all, was exceedingly vague. You work with me, I'll work with you. Can we attribute it to Mr. Cecil because he was there in the car? No. Why not? Well, on this record, Mr. Cecil disavowed any knowledge of that statement. He was specifically asked, do you remember this statement? And he said, I don't. So we have to take him at his word on that. But in addition, what the crux of the board's finding on that issue is that these forklift drivers, at least on this record, don't seem to have the kind of power that Mr. Barlow seems to have thought they had. Mr. Barlow testified that there are certain good stacks of pallets, and he knows this, because he could see of something called a blue check, and there's really no explanation in the record as to what exactly that may be, and perhaps Mr. Devine can illuminate that for us. But notwithstanding that testimony about what Mr. Barlow thought, there is no testimony from forklift drivers or other employees that, yes, these particular good stacks exist and they can be found on the dock, and forklift drivers are at liberty to go and select them and go out of their lane assignments. I have to disagree with Mr. Devine on his characterization of the record. The witness, Gary Cooper, who's the manager of the facility in question, was asked how are pallets delivered, and what he said is there are lane assignments, and those lane assignments under his testimony, he doesn't say that they're restricted to any particular area. Mr. Devine is suggesting that they're restricted to the area where the pallets are actually delivered, but that isn't what the record shows. And so what we're left with on this record is the suggestion that there are lane assignments that forklift drivers have to use. They have areas of responsibility in terms of who they deliver to, and there isn't the kind of latitude to go ranging over the dock and finding the blue-chip pallets, to which no one testified except for Mr. Barlow. Turning to the third issue, I don't know if the Court is at all interested in discussing that, the last issue is to the threats to Mr. Diamond. The Board's view is that testimony is discredited, and I would note that on page 330 of the appendix Which testimony? The testimony of Diamond about establishing the threats, supposedly. I mean, it is pretty clear, and the Board certainly His testimony about the threats from LaRocca and Kirby were uncontroverted, right? Those were, well, yeah. I mean, his testimony of what happened at the lunchroom was disputed by little, but no one was offered to dispute what he had to say about LaRocca and Kirby. Well, I think what the judge found, and this is a judge's credibility determination to which this Court generally But the ALJ has to give us the language's clear and convincing reasons. What are the clear and convincing reasons that he discredited the uncontroverted testimony of Diamond? Well, there were several reasons, and they're, again, at page 330 of the appendix. One of the persuasive points for the judge was that little denied the threat that supposedly he had made to Diamond. And given that one threat was unsupported, it was contradicted, and the judge credited little over Diamond, the judge found the rest of the threats to be suspect. In addition, he found them suspect because the Kirby threat in particular, which was a death threat, the most serious of the threats involved, apparently occurred in the vicinity of 20 to 25 other people, and yet there was no witness who testified to this. And yet LaRocca wasn't called. Why shouldn't an adverse inference have been drawn from the fact that LaRocca wasn't called? Well, the judge's view is that, and he says this at footnote 6 on page 330, I declined to draw an adverse inference because I find Diamond's testimony so implausible. That, you know, that is a fair assessment. And generally, I will just say that the rulings of an administrative law judge on factual issues like this and the handling of evidence are owed a great deal of deference. And in this case, the board doesn't believe that the company has met the standard, which is extraordinarily high. The showing has to be that the findings of the ALJ were hopelessly incredible, self-contradictory, or patently unsupportable, and the board just doesn't think that the company has met that burden in this case. If you look at page 330 of the appendix, you'll see that the judge has cited numerous bases for his decision, and none of them have really been effectively cut down by the company. Do you have any questions? Judge Henderson, do you have any questions? Thank you, Your Honor. Give you back two minutes. Thank you. Just a few things. The lane assignment piece is critically important, and I would direct your attention to Mr. Cooper's testimony. He testified in response to how the doc works. All he said was, we try to clear the doc first, and then we take stacks from the yard. If there are lane assignments on the docs, as the government said today, how do they go to the yard? It just doesn't make any sense. It is so assumed that they can take that evidence, any stacks they want to the nailers, that there is not substantial evidence supporting the board in that regard. In addition, the counsel for the government seemed to imply that Mr. Cecil met or successfully left stuff materials with the Bo Robinson folks. That is not true. The evidence is totally clear that even when he mailed it, it was returned. He had zero contact with the Bo Robinson folks, and that is a critical distinction to the case law that the board supports. I direct, in my brief, to the Fourth Circuit cases, Georgetown Dress, PPG, the Tennessee case, and also the Bristol textile case from the NLRB. All of those cases, a very big reason that there is no agency found is because of the access, the ready access they otherwise had. The other piece, not only did he not call LaRocca, but they did not call Van Artsdalen, who was the other paid organizer who was in the car with Mr. Barlow. An adverse inference should be drawn there. Thank you for your time. Thank you very much. The case is submitted.
judges: Henderson, Griffith, Kavanaugh